**Olin Clayton GRIER, Jr., and James Weathers, Jr., Plaintiffs,**

v.

**SPECIALIZED SKILLS, INC. trading as Charlotte Barber School, and Brown Sparks, Manager of the Charlotte Barber School, Defendants.**

**Civ. A. No. 2392.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 5, 1971.

Conrad O. Pearson, Durham, N. C., Jack Greenberg and James M. Nabrit, III, New York City, and Adam Stein, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

Alvin A. Thomas, Craige, Brawley, Horton & Graham, Winston-Salem, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

This is an action, filed September 8, 1968, brought by Negro plaintiffs against Specialized Skills, Inc., doing business as the Charlotte Barber School, and Brown Sparks, its manager, seeking injunctive relief requiring the school to admit the plaintiffs as trainees in their professional barber training program and to allow blacks as well as whites the opportunity to have their hair cut by student barbers at the school. Plaintiffs claim their exclusion as students and customers of the Charlotte Barber School violates the Civil Rights Acts of 1866 (42 U.S.C. §§ 1981, 1982 and 1983) and of 1964 (42 U.S.C. § 2000a–1) and offends the Thirteenth and Fourteenth Amendments to the Constitution.

Upon stipulation of counsel, the case was submitted on the basis of the pleadings, answers to interrogatories, depositions, and exhibits, and the parties' various briefs of fact and law.

### FINDINGS OF FACT

1. Plaintiffs, Olin Clayton Grier, Jr. and James Weathers, Jr., are both Negro males in their mid-thirties, married, honorably discharged Navy veterans, post office employees, graduates of Second Ward High School (Class of 1955), life-long residents of Charlotte, and personal friends since 1949. Grier took a barber's correspondence course in the Navy and spent three years as the only barber on a ship cutting the hair of all personnel, officers and enlisted men, black and white. From this experience, Grier believes that it is as easy to cut Negroid hair as to cut Caucasian hair. Grier desires to open a barber shop locally and, since his discharge from the Navy, has

investigated the possibility of veterans' benefits to help defray the costs ·of attending barber school. Weathers has had no previous barbering experience.

2. Defendants in this action are Brown Sparks, manager, and Specialized Skills, Inc. ("Specialized"), a North Carolina corporation incorporated in March 1966, which owns and operates the Charlotte Barber School. The school, which was opened in August, 1966, and is located at 404 East Trade Street in downtown Charlotte, derives its income from the tuition it charges its students and from fees it receives from its "practical skills department" where student barbers practice their trade on customers who patronize the school.

3. M. C. Whitney, a licensed barber, is the president of Specialized and has operated barber schools since 1935. In addition to the Charlotte Barber School, he presently operates a school in Winston-Salem, North Carolina. Brown Sparks, a licensed barber and instructor, is secretary of Specialized and manages the Charlotte Barber School. A. E. Spangler, a licensed barber and instructor, is responsible for reviewing applicants for the school and decides whether. or not to accept applicants. Neither Whitney, Sparks, nor Spangler have ever had any specific training in the cutting of Negroid hair.

4. On or about August 1, 1968, plaintiff Grier made a telephone call to the Charlotte Barber School and inquired about procedures for applying to the school. He was told to "come on down." The plaintiffs subsequently made plans to go to the school the next day. On August 2, plaintiff Weathers arrived at the school before Grier and encountered A. E. Spangler who informed him that the school was "not accepting colored." Grier later went into the school and was informed that applications from Negroes were not accepted. Upon further inquiry, Grier learned that some of the students at the school were receiving benefits under the G. I. Bill. Grier proceeded to the local Veterans' Administration office where an employee of the Veterans' Administration telephoned Spangler. Spangler repeated to the employee that applications from blacks were not accepted at the school. Plaintiffs later brought this action.

5. The school's criteria for initial applicants are the following:

"Applicants shall be of the white race and shall understand and know that the school only teaches barbering on white patrons. They shall be clean and neat in person and dress. They shall not have been convicted of a felony. They shall not be addicted to the use of alcohol or drugs. They shall have no physical disabilities that would hinder their work as a barber. They shall be financially able to complete the course of training. The applicant is required to take a written test and make a passing grade on same." (Answer to plaintiffs' interrogatory No. 5.)

At his deposition (p. 44), Whitney admitted that both plaintiffs were "neat and clean." The defendants have made no contention that the plaintiffs were denied an opportunity to apply to the school on any ground other than race. The defendants' clear intention has been to prevent blacks from enrolling in the barbering course.

6. Chapter 86 of the North Carolina General Statutes regulates the state barbering trade. Individual barbers, barber shops, and barber schools must be licensed. The regulatory scheme is administered by the State Board of Barber Examiners. There is no Negro on the State Board, nor has there ever been.

State regulations require that a prospective barber complete 1,528 hours of prescribed instruction in a licensed barber school. A major portion of this training consists of the practical application of skills learned in the classroom. Following this period of instruction at a licensed barber school, a prospective barber must pass an examination administered by the State Board and serve an eighteen-month apprenticeship before he receives his state license.

7. The school operates a practical skills department for the benefit of the students. Any white male may have his hair cut by the student barbers. No appointment is required, and one merely enters the school at his pleasure to be served. A $1.00 fee is charged each practical skills customer. This fee is less than one-half the going rate for haircuts in Charlotte. Members of certain welfare and orphanage groups are given free haircuts. Blacks are not allowed to take advantage of defendants' practical skills department. School officials say that they are not equipped or qualified to cut Negroid hair.

8. There are approximately 2,700 barber shops in North Carolina. Of these shops, approximately 1,500 are operated by white barbers and serve a white clientele. There are approximately 1,200 barber shops operated by black barbers. About 85 black barbers cater to a white trade (Whitney Deposition, p. 9) ; the remaining black barbers cater to blacks.

There are five barber schools in North Carolina. Three train white barbers; two (in Durham and Raleigh) train blacks. Each school has two instructors and a capacity of 50 students.

9. At his deposition, M. C. Whitney stated that the defendants' primary reason for refusing to accept Negro applicants at the Charlotte Barber School is that an entirely different technique is utilized to cut Negroid hair as opposed to Caucasian hair. It was Whitney's opinion that Negroid hair is more difficult to cut properly than Caucasian hair. He stated that "a really good colored barber * * * is almost an artist." (Whitney deposition, p. 39.) The school does not want a black to incur tuition and other expenses when its instructors would be unable to provide professional training with respect to the barbering of Negroid hair. Whitney testified that if a Negro showed a strong interest in learning to cut Caucasian hair and was otherwise qualified he would be accepted at the school (Whitney deposition, p. 14). There was no inquiry made by defend-

ants whether the plaintiffs, when they attempted to apply to the school, desired training in the cutting of the hair of any particular race.

Plaintiff Grier said that from his Navy barbering experience he felt it was just as easy to cut Negroid hair as to cut Caucasian hair. In the text book prepared and used by the Charlotte Barber School entitled PRACTICE AND SCIENCE of STANDARD BARBERING (1967) (defendants' Exhibit No. 2), the authors set as a professional standard the "distinctive cutting and arrangement of the hair to suit the individual requirements of a patron" (p. 101). An entire chapter (Chapter 9) is devoted to "Cutting and Styling Curly and Over-Curly Hair" (see p. 155ff.). It is stated that "[o]ver-curly hair is present in all races to a greater or lesser degree" and that learning to cut such hair is a "challenge to the well-trained barber." The authors discuss the special characteristics of Negroid hair and conclude that "individual hair texture among Negroes may vary from one person to another" (p. 156). A detailed illustrated discussion of hair cutting is contained in Chapter Nine. The discussion utilizes photographs of Negroes (see, e. g., pp. 158–162 and 171–182) and shows how to use clippers, shears, scissors, combs, and other common barber tools to cut Negroid hair. There is no indication apparent in this text book that barbers trained in the Charlotte Barber School would not be qualified to cut the varying types of Negroid hair. The inference, in fact (though not necessary to decide this case), is to the contrary.

10. The defendants in practice discriminate against Negroes by denying them instruction and service on account of their race.

CONCLUSIONS OF LAW

1. The court has jurisdiction over this controversy under 28 U.S.C. § 1343 (3) and (4).

2. This is a proper class action under Rule 23 of the Federal Rules of

Civil Procedure. The class is all Negroes who might want to enroll as students or to be served as customers at the Charlotte Barber School.

3. The discrimination against the Negro plaintiffs in their efforts to make contracts for barber training and haircuts is prohibited by 42 U.S.C. § 1981, the Civil Rights Act of 1866. The Civil Rights Act of 1866, Section 1, in pertinent part, originally read as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all persons born in the United States and not subject to any foreign power, * * * are hereby declared to be citizens of the United States; and such *citizens, of every race and color,* without regard to any previous condition of slavery or involuntary servitude, * * * *shall have the same right,* in every State and Territory in the United States, *to make and enforce contracts,* to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, *as is enjoyed by white citizens,* and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." (Emphasis added.)

In 1870, after passage of the Fourteenth Amendment, the above-quoted sentence was divided into two separate sentences and re-enacted in two adjacent sections, now codified as 42 U.S.C. § 1981 and § 1982.

As a result of this recodification and re-enactment, § 1981, since 1870, reads as follows:

"*All persons* within the jurisdiction of the United States *shall have the same right* in every State and Territory *to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." (emphasis added);

and § 1982 reads as follows:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

It is apparent from reading the text of the original 1866 statute, and the text of its two present component parts, § 1981 and § 1982, that § 1981 and § 1982 are not merely "sister statutes," or statutes "*in pari materia*"; they are in fact both parts of what was originally the same section, the same sentence, the same clause and for the most part, the same phrase of the Civil Rights Act of 1866. Canons of interpretation and legislative history which give meaning to § 1982 should give meaning likewise to § 1981.

In its landmark decision in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), the Supreme Court, construing Section 1982 of the 1866 Civil Rights Act, 42 U.S.C. § 1982, held that:

"* * * § 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment * * *."

The broad remedial purpose evident in *Jones* was further expanded by the Supreme Court in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), which held that interference by a third party with a Negro's right to *lease* property gave rise to a cause of action under § 1982.

Study of the *Jones* rationale and subsequent Supreme Court and inferior court decisions indicates that Section 1981, like Section 1982, should be con-

strued to give effect to the similar remedial legislative intent which it embodies. That is, Section 1981 bars private discrimination with respect (among other things) to the making and enforcing of contracts, and is a valid exercise of Congress' power to enforce the Thirteenth Amendment. See, Note, "Jones v. Mayer: The Thirteenth Amendment and the Federal Antidiscrimination Laws", 69 Columbia Law Review 1019 (1969).

The entire Court in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883) had earlier agreed that the intent of Congress evident from the 1866 Civil Rights Act was to wipe out the "burdens and disabilities" of slavery by securing "to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts * * * and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens." Civil Rights Cases, supra, at 22, 3 S.Ct. at 29. Cf. id., at 35, 3 S.Ct. at 39 (dissenting opinion of the first Mr. Justice Harlan). See also, Jones, supra, 392 U.S. at 441, 88 S.Ct. at 2204 (footnote 78). It is this Congressional intent, an intent to provide remedial legislation to overcome injustices engendered by centuries of slavery, which was legislated in 1866, lay dormant until Jones, and is now recognized as preventing racial discrimination in the area of contracts.

Defendants urge that since the Supreme Court in Jones v. Alfred H. Mayer Co., relied on § 1982 instead of on § 1981, it should be concluded that § 1981 applies only to state-sanctioned discrimination. This court is unable to agree with that view. The Supreme Court's reliance, in a real estate contract case, on § 1982, the part of the statute dealing specifically with real estate contracts should not be interpreted in this contract case to eliminate the relevance of § 1981, the part of the statute dealing with contracts generally. The re-enactment of § 1982 and its 1870 recodification subsequent to the passage of the Fourteenth Amendment "were [not] meant to limit its application to state action." Jones, supra, p. 436, 88 S.Ct. p. 2201. The same reason and principle apply to § 1981.

In cases subsequent to Jones v. Albert H. Mayer Co. in which the interpretation of Section 1981 has been squarely faced, lower courts have almost uniformly held that Section 1981 should be construed in the broad fashion accorded Section 1982 in Jones to prohibit private discrimination in other contract matters. See Scott v. Young, 421 F.2d 143 (4th Cir., 1970), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (admission to privately owned recreational facility); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir., 1970) (employer's discriminatory termination procedures); Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir., 1970) (private racial discrimination in employment); Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio, 1968) (membership in and/or referral status in a labor union is a contract subject to the mandates of Section 1981); United States v. Medical Society of South Carolina, 298 F.Supp. 145 (D.S.C., 1969) (right of blacks to be admitted as patients to a private hospital); Clark v. American Marine Corporation, 304 F.Supp. 603 (E.D.La., 1969); Central Contractors Assoc. v. Local Union No. 46, etc., Electrical Workers, 312 F.Supp. 1388 (W.D.Wash., 1969). To the contrary are Colbert v. H-K Corp., Inc., 295 F.Supp. 1091 (N.D.Ga., 1968); Culpepper v. Reynolds Metals Co., 296 F. Supp. 1232 (N.D.Ga., 1968), reversed on other grounds, 421 F.2d 888 (5th Cir., 1970).

The defendants contend that even if Section 1981 covers purely private discrimination the black plaintiffs have requested a course of training (i. e. training in the cutting of Negroid hair) which is not even offered to white students. The court does not so construe plaintiffs' demands. Under Section 1981, plaintiffs have the "same right * * * to make and enforce contracts * * *

as * * * white citizens." That is, black barber students are entitled to the *same* training (not a superior or different training) for their dollar as their white counterparts. While the evidence tends to establish that the Charlotte Barber School endeavors to produce barbers qualified to cut hair of varying types and textures (including "over-curly" hair), the school is required to do no more than offer black students the same training it provides white trainees. No new equipment need be purchased and no additional courses need be offered. If plaintiffs successfully complete the school's course and are licensed by the state, they personally will bear the burden of deciding whether they are qualified to cut a particular patron's hair—and the burden of getting a particular person's patronage.

4. Under these facts, the discrimination against plaintiffs is state action, prohibited by the equal protection clause of the Fourteenth Amendment. The discrimination is sanctioned by the state. In order to obtain a state license, state-wide regulations require a prospective barber to attend an approved, licensed school. All the licensed schools in North Carolina are segregated. They are the exclusive means by which the training required for a barbering license can be obtained in North Carolina. The state has turned over to a "private" agency part of its state prerogatives and is supporting that agency in its performance of a state function. Where seemingly private entities are allowed or designated to perform govermental functions, their "private" actions may become state action in Fourteenth Amendment terms, and they may be treated as extensions of the state. See, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (court imposed First and Fourteenth Amendment freedoms on a company town); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) and its progeny, e. g., Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (the Texas white primary cases); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (state maintenance of a segregated park); and Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (state constitutional amendment preventing open housing legislation). As Mr. Justice Frankfurter stated in Terry v. Adams, *supra*, 345 U.S. at 473, 73 S.Ct. at 815 (separate opinion): "[T]he vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials panoplied with State power * * *." See generally *Black*, "Foreword: 'State Action,' Equal Protection, and California's Proposition 14", 81 Harvard Law Review 69 (1967). See Hawkins v. North Carolina Dental Society, 355 F.2d 718 (4th Cir., 1966).

■ 5. Plaintiffs have standing to challenge the refusal of the defendants to accept black patrons as customers of the practical skills department. The defendants have questioned plaintiffs' standing to raise that issue. However, where illegal racial segregation is established in one aspect of a particular institution, plaintiffs should not be required to prosecute separate lawsuits in order to remedy each different aspect of segregation. See, e. g., Rackley v. Board of Trustees of Orangeburg Regional Hospital, 310 F.2d 141, 143 (4th Cir., 1962); Cypress v. Newport News General and Nonsectarian Hospital Association, 375 F.2d 648 (en banc) (4th Cir., 1967); Whitley v. Wilson City Board of Education, 427 F.2d 179 (en banc) (4th Cir., 1970).

■ As discussed last term in the Supreme Court, standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to "cases" and "controversies." There is a two-pronged test: (1) an individual plaintiff must have a sufficient personal interest (economic or otherwise) to impart the concrete adverseness required by Article III, and (2) the interest which the plaintiff seeks to protect must be within the "zone of

interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 830, 832, 25 L.Ed.2d 192 (1970). In this particular case, the plaintiffs, once they are admitted to defendants' school, will have an immediate interest in who patronizes the school. Moreover, they have an immediate present interest in the fact that, solely because of their race, they cannot have their hair cut at the Charlotte Barber School. Since Section 1981 by its terms prohibits discrimination in the making of a contract, the second standing requirement of the Data Processing Service analysis is also met.

6. It is not assumed that Jones v. Alfred H. Mayer Co. and Sullivan v. Little Hunting Park have answered all the unforeseen questions which may arise as to discrimination in contract matters *vis-a-vis* the Thirteenth and Fourteenth Amendments and Sections 1981 and 1982. Nor should they be read to portend the complete irrelevance of "state action" in assessing the constitutionality or legality of discriminatory conduct. Absent state action or express constitutional prohibition, personal discrimination in a variety of private matters is a continuing and natural aspect of constitutional freedom; liberty must find room for diversity, narrowness and peculiarity, so long as they do not impose upon others.

These philosophical caveats, however, shed no serious doubt on the result here. Both under the apparent rationale of *Jones* and *Little Hunting Park*, and under the "state action" rationale, these plaintiffs are entitled to relief today. Tomorrow's case will have to be decided on its own equities.

7. Because the reasons set out above appear to be adequate bases for decision of the case, the court does not attempt to decide the contention that defendants' conduct violates 42 U.S.C. § 2000a–1, the Public Accommodations Act.