EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

The HOME INSURANCE COMPANY,
Defendant.

No. 78 CIV 6242 (LBS).

United States District Court,
S.D. New York.

Dec. 14, 1982.

As Amended Dec. 21, 1982.

William J. Lee, Regional Atty., N.Y. Dist. Office, Virginia Waters, James L. Lee, New York City, for plaintiff.

Kelley Drye & Warren, Eugene T. D'Ablemont, Martin D. Heyert, Paul L. Bressan, Michele J. Silak, New York City, for defendant.

## OPINION

SAND, District Judge.

This action was commenced on December 28, 1978, under § 7(b) of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (the "ADEA" or the "Act"), and § 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. (the "FLSA").[1] Jurisdiction is founded on ADEA § 7(c), 29 U.S.C. § 626(c).

Plaintiff, the Equal Employment Opportunity Commission (the "EEOC"), alleges that defendant, The Home Insurance Company ("Home"), violated ADEA § 4(a) when it reduced the mandatory retirement age under its retirement plan from 65 to 62. This change became effective in 1974, prior to the 1978 amendment to the Act which prohibited employers from involuntarily retiring employees under age 70 because of their age. Pub.L. 95–256, § 2(a), 92 Stat. 189. See [1978] U.S.Code Cong. & Ad.News 504.

Plaintiff seeks an injunction restraining defendant from withholding wages allegedly owed 143 former Home employees who were involuntarily retired prior to age 65 and also asks that the Court permanently enjoin defendant and its employees from violating the provisions of ADEA § 4. Defendant denies that it violated the ADEA and asserts several affirmative defenses, claiming, inter alia, that this action is time barred; that the lowering of the mandatory retirement age was lawful under ADEA § 4(f)(2), 29 U.S.C. § 263(f)(2); and that it acted in good faith reliance on administra-

tive rulings and regulations as permitted under § 10 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 259.

## I. PROCEDURAL SETTING

This case is before the Court on remand from the Court of Appeals for the Second Circuit, 672 F.2d 252 (2d Cir.1982), rev'g and remanding 25 E.P.D. [CCH] ¶ 31,556 (S.D. N.Y. January 21, 1981). The issue of liability has been tried to the Court, with the issues relating to remedy reserved pending the outcome of this trial. Plaintiff's motion, returnable the first day of trial, to amend its complaint to assert a claim for liquidated damages under FLSA § 16(c), 29 U.S.C. § 216(c), was denied in an oral Opinion delivered the same day. See Trial Transcript, at 10–28. Upon the close of trial, plaintiff renewed its motion for leave to amend its complaint, which the Court hereby denies for the reasons stated in its prior Opinion.

The following constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.Proc. 52(a).

## II. FACTS

Home, since 1948 and at all times relevant to this suit, maintained a noncontributory retirement benefit plan for its employees (the "Plan"). From the date of its adoption until its amendment effective January 1, 1974, the Plan provided for "mandatory" and "normal" retirement at age 65. As the term implies, the mandatory retirement age is the age beyond which the employee is not permitted to work; the normal retirement age is the age at which an employee can retire without any actuarial reduction in pension benefits. The Plan also provided that an employee could retire between the ages 55 and 65 with reduced pension benefits.

In the latter part of 1972, in anticipation of an upcoming review of all employee ben-

---

1. Subsequent to the filing of the complaint in this action by the Secretary of Labor, the FLSA was amended by Reorganization Plan No. 1 of 1978, 92 Stat. 3781, to provide for the transfer of enforcement authority from the Secretary to the EEOC, effective July 1, 1979. A consent order substituting the EEOC as plaintiff was entered by this Court shortly thereafter.

efits at Home, Joseph F. Quinn, general counsel and senior vice-president of Home, commissioned a study by Towers, Perrin, Forster & Crosby ("Towers, Perrin"), a consulting firm in the field of employee benefits. According to Mr. Quinn's testimony, the purpose of this study was to consider means by which Home's employee benefits could be made more competitive with those offered elsewhere in the industry. Specifically, consideration was to be given to reducing the Plan's normal retirement age to 62. On March 29, 1973, Towers, Perrin issued the commissioned study, recommending, *inter alia,* that early retirement be liberalized to allow "retirement on unreduced accrued benefits after age 62 and 10 years of service." Defendant's Exhibit F, at 13–14, 43. The only reference in the study to the mandatory retirement age was a recommended minor change relating to the date following an employee's 65th birthday upon which retirement should occur. *Id.* at 43.

The study was presented to Home's Retirement Committee (the "Committee"), which, despite its limited title, was charged with reviewing all employee benefits for the purpose of recommending changes to the board of directors.

The Committee departed from the Towers, Perrin study in two significant respects. After reviewing the study, the Committee decided to increase early retirement benefits by further diminishing the actuarial reduction for employees retiring between the ages 58 and 61. In addition, the Committee adopted at the last of its meetings the suggestion of one of its members, Roger Bayles, that the mandatory retirement age be reduced to 62.

The Committee's recommendations were then set forth in a memorandum from Mr. Quinn to Messrs. Washburn and Tullis, Home's chairman of the board and president, respectively. Although the memorandum was silent as to the Committee's reasoning for the lowered mandatory retirement age, with regard to the lowered actuarial reductions it stated:

"Under this schedule the penalty for early retirement at ages 57 through 61

would be significantly reduced from present and the Committee feels that this is consistent with its objective of promoting turnover."

Defendant's Exhibit G, at 2.

Among the amendments to the Plan ultimately adopted by Home's board of directors and made effective January 1, 1974, were the lowering of both the mandatory and normal retirement ages from 65 to 62 and the increase of pension benefits payable to those retiring between the ages of 55 and 62. In addition, to lessen the disruptive impact that the lowered mandatory retirement age would have on Home's older employees, a grandfathering provision was adopted. Under this provision, all employees age 60 or older on January 1, 1974, could continue to work until the earlier of the July 1st nearest their 65th birthday or January 1, 1977.

Home, wishing for purposes of employee relations to publicize its enhancement of employee benefits (which increased the annual cost of such benefits by an estimated $1,447,000), resorted to several means to apprise its employees of the changes made. The most significant of these were a four-page brochure issued in late 1973 and a new employee-benefit handbook distributed in early 1974. In addition, a slide-talk presentation of the Plan changes was prepared and given to Home's senior and middle management personnel, who in turn convened meetings of all employees in defendant's various branch offices and explained the Plan changes by similar slide presentations and/or general discussion. Home in these communications assiduously avoided the use of the term "mandatory": the term appears nowhere in the sixty-page handbook and but once, in parentheses and with no elaboration, in the brochure; the slide presentation refers solely to changes in the *normal* retirement date. However, the presence of a grandfather clause to deal with those "caught by surprise" by the amendment served to make clear that retirement at age 62 was not otherwise optional.

Subsequent to, and independent of, these efforts, sometime between late November and mid-December 1974 each employee received by mail at his residence a data sheet setting forth employee benefit and retirement-related information, known as a "Benefacts statement." Such Benefacts statements were mailed annually to each employee around Thanksgiving time pursuant to a contractual relationship between defendant and Benefacts, Inc., an independent consultant in the field of employee-benefit communication. The testimony discloses that these statements were an annually received item, eagerly awaited and much discussed by the employees and creates the strong presumption that each employee received his or her Benefacts report for 1974, the first such report to reflect the 1973 Plan amendments. Their content, in relevant part, is amply exemplified by the following excerpt from Defendant's Exhibit N–8 (a Benefacts statement sent to an employee subject to the grandfather clause), the underscored text representing individualized insertions:

"When you retire at age *63* on *January 1, 1977,* you will receive estimated monthly benefits of *$615* from the Home Retirement Plan, and Social Security."

The straightforward language employed in this report—prepared by a consulting firm specializing in employee-benefit communications—and the testimony at trial generally depicting the nature and extent of the discussion evoked by the lowered mandatory and normal retirement ages, as well as by the grandfathering provision, clearly establish that these 1974 Benefacts statements individually notified each employee of the date upon which he or she would be compelled to retire.

Plaintiff claims that defendant has failed to sustain its burden of proving that each of the 143 employees received notice of a mandatory retirement date. But, as noted *supra,* the evidence shows that, in addition to the brochures and Benefacts mailing, Home held a series of meetings to explain the changes effected in the Plan to all of its employees. The testimony indicates that, not surprisingly, these changes were the subject of widespread discussion among the employees. While Home, in its efforts to maximize the positive aspects of the Plan changes, underplayed the mandatory nature of the lowered retirement age, it is difficult to conceive that any employee nearing that age was not fully aware of the change. Although Home has the burden of proof on the issue of notification, it certainly adduced enough evidence so that it is not without significance that not a single one of the 143 employees was called to testify to a lack of knowledge in late 1974 that the mandatory retirement age had been lowered.

The first of what ultimately amounted to 143 terminations under the lowered mandatory retirement age provision took place on February 1, 1976; the two-year gap between the provision's adoption and the first termination was occasioned by the grandfathering clause. Anywhere from one to twelve months prior to termination, the employee would receive a form headed "Office Memorandum", which stated the individual's date of retirement, the several options available for the distribution of retirement benefits, and other information relating to retirement. Employee terminations continued from February, 1976 until Home once again amended the mandatory retirement provision, effective October 1, 1977, by raising the mandatory retirement age to 65.

## III.  PROCEDURAL ISSUES

### A.  *The Statute of Limitations*

We consider first defendant's assertion, which the parties have fully briefed and argued at this stage of the proceedings, that the monetary relief plaintiff seeks on behalf of the 143 employees is time-barred. It is defendant's contention that this monetary relief is barred by the statute of limitations set forth in the Portal-to-Portal Act (the "PPA") § 6(a), 29 U.S.C. § 255(a),[2]

---

**2.** Section 6(a) of the PPA provides that an action must be commenced

"within two years after the cause of action accrued, except that a cause of action arising

made applicable to ADEA actions brought under FLSA § 17 by ADEA § 7(e)(1), 29 U.S.C. § 626(e)(1),[3] as well as by the express terms of FLSA § 17.[4]

The evident purpose of the proviso appearing at the end of FLSA § 17 is to preclude the EEOC, as the plaintiff in an injunctive proceeding, from obtaining monetary relief on behalf of individuals whose claims would be time-barred were they themselves bringing suit. The statute, therefore, requires us to entertain the fiction of the filing of complaints by the 143 individuals on December 28, 1978, seeking back pay awards under the ADEA for unlawful termination. Whether such hypothesized actions would be timely determines whether the relief sought by plaintiff may be granted.

### 1. The Commencement of the Limitations Period

Defendant's argument is premised on three points: first, that any ADEA violation occasioned by the adoption of the lowered mandatory retirement age occurred only at the time the Plan was amended, and not when individual employees were compulsorily retired thereunder; second, that notice to each employee, including the 143 terminated, of the Plan's amendment and their respective mandatory retirement dates thereunder, was given by means of the four-page brochure or the employee handbook distributed in November, 1973 and February, 1974, respectively, or in the alternative, by the Benefacts mailing in December, 1974; and third, that any causes of action for unlawful termination accrued when the 143 were notified of their retirement dates, rather than their last day of employment. These assertions, if correct, would compel a determination that the monetary relief sought is barred for, even assuming *arguendo* a three-year limitations period under § 255 and the tolling period argued for by plaintiff, the causes of action would have accrued over four years prior to the filing of the complaint.

Of these three assertions, it is the last—that any cause of action available to these 143 individuals accrued on the date of notification of the Plan's amendment and their new retirement date—that is the most troubling. Support for this assertion, according to defendant, lies in two Supreme Court decisions, *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam).

*Ricks* involved a Liberian academician denied tenure by his employer allegedly on racially discriminatory grounds. Pursuant to its general practice when an unfavorable tenure decision is made, defendant offered plaintiff a one-year termination contract and the option of pursuing grievance procedures, both of which plaintiff accepted. Plaintiff's filings of a Title VII charge with the EEOC and an action under 42 U.S.C. § 1981 were timely as measured from the date of the terminal contract's expiration, as well as from the date on which plaintiff was informed of the unfavorable outcome of the grievance procedure. The court of

out of willful violation may be commenced within three years after the cause of action accrued."
29 U.S.C. § 255(a).

3. Section 7(e)(1) of the ADEA states:
"Sections 255 and 259 of the title shall apply to actions under this chapter."
29 U.S.C. § 626(e)(1).

4. FLSA § 17 states, in relevant part, that the district courts
"shall have jurisdiction, for cause shown to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter (*except sums which employees are barred from recovering, at the time of the commencement of the action to restrain the violations, by virtue of the provisions of section 255 of this title*)."
29 U.S.C. § 217 (emphasis supplied). Section 7(b) of the ADEA states in relevant part:
"Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of actions 216 and 217 of this title."
29 U.S.C. § 626(b).

appeals held that, because the initial decision denying tenure might be rescinded, plaintiff's cause of action did not accrue until his last day of employment. The Supreme Court reversed, holding that the statute began to run when plaintiff was officially notified that he was being denied tenure.

"Determining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains. . . .

In sum, the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later. . . . It is simply insufficient for Ricks to allege that his termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.' . . . The emphasis is not upon the effects of earlier employment decisions; rather, it 'is [upon] whether any present *violation* exists.'"

449 U.S. at 257–258, 101 S.Ct. at 503–504 (footnote and citations omitted; emphasis in original).

In *Chardon,* the Supreme Court reaffirmed its opinion in *Ricks,* and reversed an appellate court opinion holding *Ricks* to be limited to a denial-of-tenure case and thus inapplicable where the unlawful employment practice alleged is termination. Characterizing *Ricks* and *Chardon* as indistinguishable, the Supreme Court stated:

"[I]n each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated. In *Ricks,* we held that the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act became painful. *Id.,* at 258 [101 S.Ct. at 504]. The fact of termination is not itself an illegal act. In *Ricks,* the alleged illegal act was racial discrimination in the tenure decision. *Id.,* at 259 [101 S.Ct. at 504]. Here, respondents allege that the decision to terminate was made solely for political reasons, violative of First Amendment rights. There were no other allegations, either in *Ricks* or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made. As we noted in *Ricks,* '[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.' *Id.,* at 257 [101 S.Ct., at 504]."

454 U.S. at 8, 102 S.Ct. at 28–29 (footnote omitted, emphasis in original).

■ It is established that *Ricks* and *Chardon* are applicable to ADEA cases. *E.g., Pfister v. Allied Corp.,* 539 F.Supp. 224 (S.D.N.Y.1982); *Aronsen v. Crown Zellerbach,* 662 F.2d 584 (9th Cir.1981); *EEOC v. Kimberly-Clark Corp.,* 531 F.Supp. 58 (N.D. Ga.1981). Plaintiff's contention that *Ricks* and *Chardon* apply only to the timeliness of filing a charge with the EEOC, as required by ADEA § 7(d), 29 U.S.C. § 626(d),[5] and do not govern the issue of timeliness under ADEA § 7(e)(1) and PPA § 6(a), 29 U.S.C. §§ 626(e)(1), 255(a), is untenable. In *Ricks,* the Supreme Court determined the untimeliness of the employee's filings under both Title VII and 42 U.S.C. § 1981.[6] The Court there drew no distinction between the com-

---

**5.** Under Title VII, an aggrieved individual must file a charge against an employer within 180 days (or 300 days if there exists a state, EEOC-type agency) after the occurrence of the "alleged unlawful employment practice." 42 U.S.C. § 2000e–5(e). Similar statutory language is embodied in ADEA § 7(d), 29 U.S.C. § 626(d) (filing required within 180/300 days after the "alleged unlawful practice occurred"). *See* note 9 *infra.* The applicability of *Ricks* and *Chardon* to ADEA § 7(d) was the subject of this Court's decision in *Pfister v. Allied Corp.,* 539 F.Supp. 224 (S.D.N.Y.1982).

**6.** The limitations period for a § 1981 claim is that applicable to an analogous cause of action under the law of the relevant state. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). In *Ricks,* the applicable limitations period was three years. 449 U.S. at 255 n. 5, 101 S.Ct. at 502 n. 5.

mencement of the two limitations periods. Moreover, in *Chardon,* the Court considered the timely filing of a complaint under 42 U.S.C. § 1983; no charge filing with the EEOC was at issue in that case.

Likewise, plaintiff's reliance on the phrasing of § 255(a) to argue that the statute can only begin to run when a cause of action "for amounts owing" has accrued is misguided: simply put, this section limits the availability of monetary relief for "stale" claims; it cannot be read to "keep fresh" such claims until some monetary harm is suffered. Furthermore, to adopt plaintiff's position would mean that for the purposes of filing an ADEA charge, the cause of action accrues on one day, while the statute of limitations commenced to run on another. Absent circumstances calling for the equitable tolling of the latter, such a result would be unwarranted and contrary to a fair reading of *Ricks* and *Chardon.*

Plaintiff also asserts that no notice of the type found in *Ricks* and *Chardon* was given here. We are of the opinion, however, that the totality of defendant's communications to its employees, culminating in the Benefacts statement sent by mail to each Home employee, meets the notice criteria implicit in *Ricks* and *Chardon, viz.,* reasonably calculated to apprise the employee of an allegedly discriminatory act taken with regard to employment.

Plaintiff's alternative contention, that each employee received notification only upon the receipt some one-to-twelve months prior to termination of the Office Memorandum, by which the employee was to elect the actuarial method by which pension benefits should be disbursed, is similarly unavailing. These forms add nothing to the information earlier related by the Benefacts statements. The only distinction between the two communications is the later receipt of the election forms, but such a distinction is insignificant. *See Ricks, supra,* 449 U.S. at 261, 101 S.Ct. at 505 (subsequent affirmation of an already communicated official position deemed irrelevant).

Finally, and most persuasively, plaintiff argues that the instant case is governed by the continuing violation theory, *i.e.,* that the 143 individuals on whose behalf the EEOC seeks backpay suffered a violation of their ADEA-protected rights that continued from the date of their notification of employment until the date on which each employee ceased work. Accordingly, plaintiff asserts the cause of action did not accrue until the last day of employment for each employee. In support of this contention, plaintiff relies on, *inter alia, Morelock v. NCR Corp.,* 586 F.2d 1096 (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *Guardians Ass'n v. Civil Service Commission,* 633 F.2d 232 (2d Cir.1980), *pet. for cert. filed,* 51 U.S.L.W. 3021 (U.S. Aug. 3, 1982) (No. 81-432); and *Acha v. Beame,* 570 F.2d 57 (2d Cir.1978). *But see Bronze Shields, Inc. v. New Jersey Dep't of Civil Service,* 667 F.2d 1074 (3d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982).

For statute of limitations purposes, we must assume that the lowered retirement age, which continued unequivocally in effect until sometime subsequent to the termination of the 143 employees, continued in effect indefinitely regardless of the knowledge which hindsight affords us of the subsequent changes made by Home and by Congress. Home in no way suggested prior to the retirement of the 143 employees that it was reconsidering or reevaluating the lowered retirement age (and in this respect Home's notification was far more emphatic and less equivocal than the notice in *Ricks,* wherein reference was made to pending grievance proceedings). For this reason, plaintiff's reliance on *Crosland v. Charlotte Eye, Ear, & Throat Hospital,* 686 F.2d 208, 29 E.P.D. ¶ 32,958 (4th Cir.1982), where defendant's equivocation as to its intention to include plaintiff in its retirement pension plan obviated a finding of notice prior to plaintiff's retirement, is misplaced.

■ It is well established that an unlawful discriminatory policy maintained by an employer constitutes a continuing violation. *Guardians Ass'n, supra* (refusals to hire); *Acha v. Beame, supra* (same); *Morelock v. NCR Corp., supra* (seniority system); *Jen-*

*kins v. Home Insurance Co.,* 635 F.2d 310 (4th Cir.1980) (wage scales); *Rich v. Martin Marietta,* 522 F.2d 333 (10th Cir.1975) (promotion system). *Compare Moreman v. Georgia Power Co.,* 310 F.Supp. 327 (N.D. Ga.1969) (union's acquiescence in maintenance of discriminatory contract provision held to be continuing violation), *with Culpepper v. Reynolds Metals Co.,* 296 F.Supp. 1232 (N.D.Ga.1969), *rev'd and remanded on other grounds,* 421 F.2d 888 (5th Cir.1970) (employer's failure to award a job to a single black employee held not to be continuing violation).

More specifically, a discriminatory policy effected through a provision in an employer's retirement plan has been held to be a continuing violation. *Peters v. Missouri Pac. R.R. Co.,* 483 F.2d 490, 492 n. 3 (5th Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 238 (1973); *Bartmess v. Drewys USA, Inc.,* 444 F.2d 1186 (7th Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971); *American Finance System, Inc. v. Harlow,* 65 F.R.D. 94 (D.Md. 1974); *Mixson v. Southern Bell Tel. & Tel. Co.,* 334 F.Supp. 525 (N.D.Ga.1971).

■ Thus, defendant's adoption and maintenance of an unlawful mandatory retirement policy was a continuing violation in the sense of a discriminatory "condition of employment", as that term is used in ADEA § 4(a)(1), 29 U.S.C. § 623(a)(1). *See United Air Lines, Inc. v. McMann,* 434 U.S. 192, 208–09, 98 S.Ct. 444, 452–53 (1977) (Marshall, J. dissenting); *cf. Bartmess v. Drewys USA, Inc., supra,* 444 F.2d at 1188; *accord Moreman v. Georgia Power Co.,* 310 F.Supp. 327 (N.D.Ga.1969). In addition to the plain import of ADEA § 4(a)(1) that calls for this determination, a contrary position would effectively insulate forever from legal redress an unlawful retirement policy two or three years subsequent to its adoption. *See Morelock v. NCR Corp., supra,* 586 F.2d at 1103. Accordingly, a suit— or an EEOC charge—against the maintenance of Home's mandatory retirement policy would be timely filed so long as the provision was maintained at least into the applicable limitations period prior to the filing. *Guardians Ass'n, supra,* 633 F.2d at 251, *quoting Acha v. Beame, supra,* 570 F.2d at 65. Such a suit could be brought by either the EEOC, a newly hired employee, or, under *Bartmess v. Drewys USA, Inc., supra,* any then-employed individual, for injunctive and, if available, monetary relief.

These conclusions direct our inquiry to the following vexatious question: Where a continuing violation of the ADEA in the form of an unlawful retirement-plan provision calling for mandatory retirement results in the termination of an employee, did Congress intend that the applicable statute of limitations for a termination claim begin to run on the date the employee is terminated or the date on which he is made aware when he will be terminated?

In resolving this issue, we begin with the recognition that *Ricks* and *Chardon* strike a balance between the remedial purposes of civil rights legislation such as the ADEA and the employer's entitlement to obtain repose as recognized in the applicable statutes of limitations. *See Ricks, supra,* 449 U.S. at 256–57, 101 S.Ct. at 503, *citing Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975).

Where no continuing violation can be alleged, as in both *Ricks* and *Chardon, see Ricks, supra,* 449 U.S. at 258, 101 S.Ct. at 504, the considerations in favor of beginning the limitations periods from the time of notification are strong. First, the employer is no longer engaged in conduct violative of statutorily protected civil rights; defendant's entitlement to repose in such instances has strong appeal. Second, the employer is protected against having to produce, many years subsequent to the occurrence of an unlawful employment practice, witnesses and documents that may well no longer be available. This concern for avoiding stale claims is especially pronounced in the context of civil rights-employment actions, where the intent with which an allegedly discriminatory action was taken is often of paramount significance to a determination of liability.

By contrast, where a continuing violation can be alleged, as here, these concerns as to a defendant's prejudice are absent or diminished: an employer maintaining a company-wide unlawful employment practice is in a less sympathetic position when seeking repose; more significantly, the continued nature of the policy represents its "affirmative perpetuation", *Kennan v. Pan Am. World Airways, Inc.*, 424 F.Supp. 721, 726 (N.D.Cal.1976), and is susceptible to characterization as a conscious waiver of limitations period protection. *See generally* Note, *Continuing Violations of Title VII: A Suggested Approach*, 63 Minn.L.Rev. 119, 143–44 (1978). Moreover, since the employer remains subject to suit by a current employee or by the EEOC, the concern respecting production of evidence as to past acts is considerably diminished. Simply put, an employer that maintains a continuing violation neither deserves nor obtains repose.

■ Viewed in this light, we are of the opinion that the rationale of *Ricks* and *Chardon* and their determination that the notification of a discriminatory termination decision commences the limitations periods are inapplicable to this case—where the presence of a continuing violation precludes the employer's obtaining repose. *Ricks* and *Chardon* impose severe restraints on remedial statutes and we are not inclined to extend their doctrine more broadly than we understand the Supreme Court or Congress to have intended. Accordingly, we hold that where an employer maintains a discriminatory mandatory retirement provision, the timeliness of a claim asserting unlawful termination thereunder should be determined with reference to the earlier of either the last day of employment, or, if applicable, the date on which the employer eliminates the unlawful provision, *see Campbell v. A.C. Petersen Farms, Inc.*, 69 F.R.D. 457, 463 (D.Conn.1975) (employer's elimination of discriminatory policy requires dismissal of complaint alleging continuing violation). By focusing on these two occurrences, the remedial policies underlying the

statute of limitations, as well as the ADEA, are most effectively served: if the unlawful provision is eliminated, the employer is assured of repose; if the provision is maintained, employer liability remains limited to terminations occurring within the applicable limitations period.

Here, because defendant maintained the allegedly unlawful policy throughout the terminations being sued upon, the relevant date for each employee is his date of termination; for the complaint to be deemed timely, it would have to have been filed within the applicable limitations period as measured by that date.

### 2. The Applicable Limitations Period

■ In determining the applicable limitations period, we must resolve the issue of defendant's willfulness, as that term is employed in PPA § 6(a), 29 U.S.C. § 255(a).[7] If willfulness is present, the three-year, rather than two-year, statute of limitations is applicable.

While this Circuit has not yet considered the issue, *see generally Goodman v. Heublein, Inc.*, 645 F.2d 127, 129 n. 9 (2d Cir. 1981), several others have construed the term "willful" expansively. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 461–62 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972); *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir.1974); *Kimball v. Goodyear Tire & Rubber Co.*, 504 F.Supp. 544 (S.D.Tex.1980); *Olsen v. Southern Pacific Trans. Co.*, 480 F.Supp. 773 (N.D.Cal.1979), *aff'd*, 654 F.2d 733 (9th Cir.1981).

In light of these holdings, we are of the opinion that defendant's reduction of the mandatory retirement age was willful as the term is employed in § 255(a). In so deciding, we take account of defendant's assertions in support of its defense under PPA § 10, 29 U.S.C. § 259. Most significant in this regard is the fact that defend-

7. *See* note 2 *supra.*

ant's general counsel, senior vice-president and chairman of the retirement committee, Joseph F. Quinn, researched the issue whether the reduction of the mandatory retirement age violated the ADEA. Accordingly, any violation stemming from the defendant's ultimate adoption of the lowered retirement age is clearly the result of a deliberate, as opposed to merely accidental or negligent, act on the part of defendant. The defendant acted in full awareness that the legality of its acts was to be governed by the ADEA, and thus its acts are categorizable as willful under § 255(a).

We find, therefore, that plaintiff's claim for monetary relief on behalf of the 143 terminated individuals is not time-barred under PPA § 6(a), because such claim was filed on December 28, 1978—within three years of their respective dates of termination, the earliest of which is February 1, 1976.[8]

## B. *The Absence of Charges and Written Consents*

Defendant contends that, in addition to the statute of limitations bar, two other procedural bars are present in this suit: first, the terminated employees on whose behalf plaintiff seeks monetary relief failed to file timely charges pursuant to ADEA § 7(d);[9] and second, plaintiff cannot obtain backpay under FLSA § 17, on behalf of those from whom it has neither secured timely consents nor whom it has identified in the complaint or other paper filed with the Court.

8. Because we hold that the complaint was filed within three years of the commencement of the statute's running, we need not consider plaintiff's arguments regarding whether and to what extent the statute was tolled during the conciliation efforts undertaken by the Secretary of Labor pursuant to ADEA § 7(e)(2), 29 U.S.C. § 626(e)(2).

9. Section 7(d) of the ADEA, 29 U.S.C. § 626(d), provides in relevant part:

"No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Secretary. Such a charge shall be filed—

Defendant's first contention is directly contrary to *Reich v. Dow Badische Co.*, 575 F.2d 363, 367 (2d Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), in which the Second Circuit stated:

"Failure to meet the sixty day notice requirements of Sections 626(d) and 633(b) ... does not extinguish the employee's substantive right; it does terminate the individual's right to commence a private civil action in his own name, but the Secretary retains the right to sue to enforce the grievant's rights wholly without reference to the notice requirements. *Dunlop v. Crown Cork & Seal Co.*, D.Md. 1976, 405 F.Supp. 774.... The Secretary's right to sue continues until the expiration of the statute of limitations."

575 F.2d at 367–68. *See also Marshall v. Chamberlain Mfg. Co.*, 601 F.2d 100, 104–05 (3d Cir.1979).

Defendant's second contention is likewise unsupportable. Section 17 of the FLSA, unlike FLSA § 16(b) and (c), 29 U.S.C. § 216(b), (c), contains no indication that written consents and the naming of claimants in the complaint as party plaintiffs are required thereunder, and courts have refused to read into this section such requirements. *See EEOC v. Gilbarco, Inc.*, 615 F.2d 985 (4th Cir.1980); *Wirtz v. Novinger's Inc.*, 261 F.Supp. 698 (M.D.Pa. 1966); *Wirtz v. W.G. Lockhart Const. Co.*, 230 F.Supp. 823 (N.D.Ohio 1964). Defendant's citation of the opinion of Judge Murnaghan in *Gilbarco, supra*, 615 F.2d at 991–1018 (concurring in part and dissenting in part), is unpersuasive, especially insofar as

(1) within 180 days after the alleged unlawful practice occurred; or
(2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier."

Section 633(b) applies in those cases in which an alleged unlawful business practice occurs in a state that has an age discrimination statute establishing or authorizing a State agency to grant or seek relief from age-related discrimination. ADEA § 14(b), 29 U.S.C. § 633(b).

that opinion relies upon the lack of any colorable rationale for Congress "to give the Secretary, under § 17, a substantial advantage denied the Secretary himself under § 16(c) and denied individual and class or collective action plaintiffs under § 16(b)." *Id.* at 992. We are of the view that there is a significant difference between a suit brought by the agency charged with the primary enforcement of the statute and one commenced by an individual or group of individuals, especially since the Secretary must, as a prerequisite to the initiation of suit, attempt to obtain the employer's compliance through conciliation efforts. ADEA § 7(b), 29 U.S.C. § 626(b). Concerning the EEOC's authority to proceed under § 17 without obtaining written consents or naming the claimants as party plaintiffs, which it is required to do under FLSA § 16(c), this distinction may be attributable to the availability of liquidated, or double, damages under the latter provision, which is absent in a proceeding under FLSA § 17. In light of these factors, we are of the opinion that reading into § 17 the complex and somewhat cumbersome requirements contained in § 16(b) and (c) would be unwarranted and that, accordingly, such requirements are inapplicable to suits, such as this, brought under § 17.

## IV. LIABILITY

Proceeding to a consideration of the merits, it is undisputed that defendant's amendment of the Plan instituting a lowered mandatory retirement age constitutes a prima facie violation of ADEA § 4(a), 29 U.S.C. § 623(a).[10]

■ Once the plaintiff has made out a prima facie case of age discrimination, the burden shifts to the defendant employer to articulate some legitimate, nondiscriminatory reason for the allegedly violative act.

---

**10.** Section 4 of the ADEA provides:

"(a) It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;"

*Parcinski v. The Outlet Co.,* 673 F.2d 34, 36 (2d Cir.1982) *citing Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

### A. *Affirmative Defenses*

Defendant claims that its alleged violations are protected from attack pursuant to ADEA § 4(f)(2), 29 U.S.C. § 623(f)(2), and PPA § 10, 29 U.S.C. § 259.

#### 1. *"Not a Subterfuge"*

■ Section 4(f)(2) of the ADEA, as in effect for the period relevant to this suit,[11] provided for an exemption for all personnel actions, except a failure to hire, taken

"to observe the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter. . . ."

29 U.S.C. § 623(f)(2).

Defendant contends that the term "subterfuge" as employed in ADEA § 4(f)(2) means that the retirement benefits payable to the retired employee pursuant to an employer's plan either were insubstantial or, if substantial, were in jeopardy of being discontinued. Although maintained previously in support of defendant's motion for summary judgment and rejected by the Second Circuit, *EEOC v. Home Insurance Co., supra,* 672 F.2d at 260, this position is now argued with renewed vigor, relying on what defendant characterizes as "newly discovered" legislative history.

The import of this legislative material is that Congress, in enacting the exemption embodied in ADEA § 4(f)(2), relied in part on state age discrimination statutes with similar exemptions, each of which employed the terms "bona fide" retirement plan

29 U.S.C. § 623(a)(1).

---

**11.** As stated *supra,* at p. 706, Congress amended this subsection in 1978 to provide that employers were prohibited from involuntarily retiring protected employees because of their age.

and/or "not a subterfuge to evade the purposes" of the statute. In addition, defendant cites a pre-ADEA Wisconsin Supreme Court case holding that there exists no difference between the two types of statutory exemptions, *i.e.,* those framed in terms of "bona fide" and those worded in terms of "not a subterfuge", and that the latter phrase requires only that a plan ensure the continued payment of substantial benefits. *Walker Mfg. Co. v. Industrial Comm'n,* 27 Wis.2d 669, 135 N.W.2d 307 (1965).

Plaintiff contends in response that the doctrine of "law of the case" precludes our consideration at this point whether "not a subterfuge" embodies a requirement wholly independent of "bona fide", in the light of the statement of the Second Circuit on this matter, *EEOC v. Home Insurance Co., supra,* 672 F.2d at 260. *See generally Munro v. Post,* 102 F.2d 686, 688 (2d Cir.1939); *United States v. Fernandez,* 506 F.2d 1200, 1201 (2d Cir.1974), *quoting* 1B Moore, Federal Practice ¶ 0.404(10), at 571; *but see Van Gemert v. Boeing Co.,* 590 F.2d 433, 436–37 n. 9 (2d Cir.1978) (doctrine is "no more than an appeal to the 'good sense' of the court"), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

We need not, however, decide whether the law of the case doctrine is applicable here. *Cf. White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967) (earlier holding not controlling, *inter alia,* where clearly erroneous and capable of working injustice). For even were we to consider this issue wholly anew, the legislative history that defendant now proffers, in conjunction with the points previously raised in this Court and before the Second Circuit, does not persuade us to adopt defendant's position. To hold as defendant urges would require us to suspend here a fundamental rule of statutory construction, *viz.,* that each word or phrase of a statute is purposefully employed. Indeed, the statutory provision under examination is a particularly appropriate subject for the application of this rule of construction, in light of the fact that the provision, in its original draft form, employed only the term "not a subterfuge"; the further limitation of "bona fide" was added only subsequent to the bill's introduction and prior to its being reported out of legislative committees.[12] Moreover, defendant's position is premised on the rejection of an expressly stated objective of the ADEA, namely, the ensuring of the continued employment of older workers as against discriminatory employment practices. *See* ADEA § 1(b), 29 U.S.C. § 621(b).

With regard specifically to the newly proffered legislative history, we note that although defendant thereby shows Congress' familiarity with state age discrimination statutes and the use therein of the terms "bona fide" and/or "not a subterfuge" in connection with a retirement plan exception, defendant fails to indicate that Congress was of the belief that the two terms were synonymous, or of the opinion

---

12. The original draft of the bill ultimately enacted as the ADEA was recommended by President Johnson on January 23, 1967, *see* 113 Cong.Rec. 1087–90 (1967), and transmitted by Secretary of Labor Wirtz to both houses of Congress that same day, *see id.* at 1377. The draft was introduced in the Senate as S. 830, 90th Cong., 1st Sess., *see id.* at 2794–96, where the retirement plan exception that was ultimately enacted as ADEA § 4(f)(2) was set forth as:

"It shall not be unlawful for an employer ... to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act;"

*Id.* at 2794. Senator Javits proposed Amendment No. 123 to S. 830, which replaced the above-quoted provision with the following:

"It shall not be unlawful for an employer ... to observe a seniority system or any retirement, pension, employee benefit, or insurance plan, which is not merely a subterfuge to evade the purposes of this Act, except that no such retirement, pension, employee benefit, or insurance plan shall excuse the failure to hire any individual;"

*Id.* at 7077. Both the Senate and the House (the latter in H.R. 13054), however, ultimately amended the bill to add the term "bona fide". *See id.* at 31,248 (Senate bill); *id.* at 34,739 (House bill); *see also* H.R.Rep. No. 805 to Accompany H.R. 13054, 90th Cong., 1st Sess. 4 (1967), U.S.Code Cong. & Admin.News 1967, pp. 2213, the version in which the provision was enacted.

that they should be. Furthermore, the paucity of state cases interpreting and applying these exceptions undercuts any resort to the notion of congressional adoption of state law in the ADEA. Indeed, in the course of congressional debates on the Act, those legislators who spoke of the state statutes made clear their impression that such statutes were to be viewed primarily as exhoratory and that their enforcement was impeded by a lack of resources; as such, it is likely that Congress looked solely to the terms of these state statutes, rather than to any applications thereof. *See* 113 Cong. Rec. 31,254 (Sen. Yarborough); *id.* at 34,752 (Rep. Dwyer); *id.* at 31,250 (quoting S.Rep. No. 723 on S. 830). Our research has uncovered no pre-ADEA case construing the term "not a subterfuge" other than the case which defendant has cited to the Court, *Walker Mfg. Co., supra,* and there is no suggestion that Congress was made aware of this single case.[13]

Accordingly, we find no basis to deviate from the Second Circuit's construction of the phrase "not a subterfuge" and proceed to a consideration whether defendant has articulated some valid business reason for the adoption of a lowered mandatory retirement age.

### 2. *Alleged Business Reasons*

■ Defendant proffers what it claims are two valid business reasons for adopting the lowered mandatory retirement age, both of which, according to testimony, Mr. Bayles stated to the retirement committee in June, 1973.[14]

First, defendant asserts that it feared the exacerbation of what it characterized as its problem of a lack of trained successors to company retirees. According to Mr. Bayles, if only the normal retirement age were lowered, an employee who reached that age, feeling less financially constrained to continue working, would be inclined to retire on short notice and without training his successor; by making the two retirement ages equal, Mr. Bayles maintained, the greater certainty as to an individual's retirement date resulted in a more orderly process of succession and better trained replacements for retirees.

We find defendant's claim that this was the basis of its decision to be contrary to the evidence. Initially we note that at the same time defendant claims that it was seeking to establish for each employee a fixed retirement date, it deliberately undercut the allegedly sought-after certainty by lessening actuarial reductions, primarily for early retirees aged 58 through 61, to an even greater degree than recommended by the Towers, Perrin study. Second, we find compelling the testimony of defendant's then-president, Mr. Washburn, that expressly refuted the claim that the lowered mandatory retirement age was adopted to force grooming of successors, as well as the testimony of Mr. Bayles himself to the effect that several training programs were in use throughout the company. Further supporting the conclusion that Home's "problem" resulting from early retirees was in fact wholly or virtually nonexistent is the de minimis number of employees aged 62 through 64 that took early retirement in 1972; of Home's 6,770 employees, only 15—or 0.2% of its workforce—retired at ages 62 through 64. Finally, we note that the low-level positions occupied by the vast majority of the individuals terminated—typists, secretaries, and clerks—and the relatively min-

---

**13.** The conclusory reasoning of the *Walker* case itself, by which the court, citing no precedent, construed the Wisconsin statute containing the term "not a subterfuge" as the equivalent of those state statutes employing the term "bona fide retirement policy", is hardly persuasive, especially because we construe here a statute that employs both these terms.

**14.** We note at this point that those objectives articulated by defendant that were accomplishable by the reduction solely of the normal retirement date, such as remaining competitive in the labor market and boosting morale, are irrelevant to discerning a valid business reason for the lowering of the mandatory retirement age, and thus warrant no discussion here. Nor do we consider in this regard defendant's assertion that it sought to boost employee morale by creating greater opportunity for advancement. *See EEOC v. Home Insurance Co., supra,* 672 F.2d at 262.

imal training such positions require indicate the inadequacy of the "grooming-of-successors" rationale. Viewing these facts against the absence of any contemporaneous document mentioning Home's alleged problem of spontaneous early retirement, we conclude that defendant's assertion that it sought to ensure trained successors does not constitute the articulation of a valid business reason for the lowering of the mandatory retirement age.

The second valid business reason defendant asserts is its purported fear of "adverse selection", an insurance industry term relating to risks but here connoting a situation where defendant's less-productive employees remained, while its more productive employees retired and, if they wished, obtained other employment while collecting Home retirement benefits. By contrast, the marginal employees, for whom job opportunities were more limited and whose retirement benefits—a function of salary—were lower, were more likely to remain in defendant's employ.

Having considered this claim, we find that even assuming it served as the basis for defendant's decision—a point which we view with significant doubt, it having been advanced only after the remand of this case and nowhere mentioned in contemporaneous documents—it is simply a euphemistic means of describing an intent to terminate marginal older employees who would otherwise wish or feel compelled to remain at Home and who would otherwise not be subject to dismissal.[15] These are precisely those whom the statute was designed to protect against precisely such employment

practices. Accordingly, defendant's reliance on its purported attempt to avoid adverse selection is wholly unavailing.

Moreover, defendant's action and the credibility of its asserted business reasons must be viewed in the context of contemporaneous statements to the effect that the lowered mandatory retirement age would result in increased promotional opportunities for Home's younger employees. As the Second Circuit pointed out, such statements suggest the violative nature of the 1973 Plan amendment, insofar as they express a desire to benefit younger employees at the cost of those older employees who would be forced to retire. *EEOC v. Home Ins. Co.,* supra, 672 F.2d at 261–63. Home's assertion that such statements were merely an attempt to check what it foresaw as dissatisfaction on the part of Home's younger employees, who were receiving little in the short term under the 1973 amendment, is incredible in light of the fact that this notion of greater promotional opportunities was first expressed, not in material intended for such employees, but in the memorandum from Mr. Quinn to Messrs. Washburn and Tullis. Defendant's Exhibit G, at 1, 2, discussed *ante* at p. 707.

### 3. *Good Faith Reliance*

Similarly unavailing and requiring little attention here is defendant's asserted defense under PPA § 10, 29 U.S.C. § 259, incorporated by reference into the ADEA in § 7(e)(1), 29 U.S.C. § 626(e)(1).[16] At trial, defendant introduced the same evidence originally offered in support of its motion

---

**15.** The latter part of this proposition is evidence from the fact that at the time of the Plan's amendment Home had an ongoing employee appraisal program pursuant to which the company could terminate substandard performers. Indeed, evidence at trial shows that employees in their sixties were terminated under this procedure in 1972–73.

**16.** Section 10(a) of the PPA states, in relevant part:

"(N)o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the

Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, or the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged."

29 U.S.C. § 259(a). ADEA § 7(e)(1), 29 U.S.C. § 626(e)(1), is quoted *supra* in note 3.

for summary judgment and found lacking by the Second Circuit. Because of the nature of the administrative rulings on which defendant allegedly relied when amending the Plan, this defense succeeds or fails in the same degree as does defendant's ADEA § 4(f)(2) defense. As the Second Circuit noted:

"(I)n order to establish a Portal Act defense, Home must prove that its reduction of the mandatory age was not a subterfuge."

672 F.2d at 265. As we concluded above, defendant has failed to put forth a nonpretextual, valid business reason with regard to the lowered mandatory retirement age, and accordingly, fails to make out a defense under PPA § 10(a), 29 U.S.C. § 259(a).

### CONCLUSION

We find plaintiff has sustained its burden of establishing that defendant violated the ADEA by terminating 143 employees pursuant to an unlawful mandatory retirement provision. We hereby refer this case to a United States Magistrate to report and recommend regarding damages, and reserve on the issue of any prospective injunctive relief until a final determination of damages.

SO ORDERED.